UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **KEVIN GROS MARINE, INC.** | \* | **CIVIL ACTION** |
| **KEVIN GROS OFFSHORE, LLC and** | \* | |
| **HOUSTON CASUALTY COMPANY,** | \* | **NO. 11-2340   SEC. "S"** |
| | \* | |
| **versus** | \* | **JUDGE MARY ANN VIAL LEMMON** |
| | \* | |
| **QUALITY DIESEL SERVICE, INC.** | \* | **MAG. DANIEL E. KNOWLES, III** |
| **and TRAVELERS PROPERTY &** | \* | |
| **CASUALTY INSURANCE COMPANY** | \* | |
| **OF AMERICA** | \* | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

Plaintiffs Kevin Gros Marine, LLC and its hull insurer, Houston Casualty Company (sometimes collectively referred to as "Kevin Gros"), have brought the instant motion for partial summary judgment seeking a determination of the effect, if any, on plaintiffs' claims as a result of a certain "Master Vendor Contract" executed between Kevin Gros Offshore, LLC and defendant Quality Diesel Service, LLC ("Quality") on or about February 1, 2009.  The complaint filed by plaintiffs alleges that in early June, 2010, defendant Quality performed an in-frame overhaul of the starboard main engine of Kevin Gros' supply vessel, the M/V CAPT. WHITEY GROS.  On May 7, 2011, the starboard main engine failed, causing a fire which engulfed the engine room of the vessel.  The complaint alleges that the cause of the failure was improper torquing of the connecting rod bolts on the No. 3 cylinder of the starboard main engine by Quality during the June, 2010 in-frame overhaul.  The total damages sustained exceed $2.9 million.

Prior to filing suit, counsel for Houston Casualty wrote to Quality inquiring as to whether Quality was in possession of any warranty agreement or other contract which would bar Kevin Gros' claims. No response was received. Plaintiffs therefore instituted this suit on September 19, 2011 (R.Doc. 1).

In response to discovery, Quality produced a document entitled "Master Vendor Contract" which apparently was signed on or about February 1, 2009.[1] Quality, since the production of the agreement, has called for Kevin Gros to dismiss the action and has tendered its defense to Kevin Gros pursuant to the terms of the Master Vendor Contract.[2]

At issue are three separate provisions of the Master Vendor Contract. The first is the warranty language contained in Section 5 of the Agreement. This provision states:

> A. Contractor ("Quality)warrants that any defects in equipment, design, materials, workmanship, quality, operating characteristics or performance of the Work of Contractor discovered or developed within six (6) months from the date of final acceptance (or such other period as is specified in the relevant work order) of the completed Work shall be promptly and timely repaired or replaced by Contractor at its sole cost and expense.

Conspicuously absent from this warranty provision is any language disclaiming implied warranties, such as the warranty of workmanlike performance implicit in all maritime service contracts. Nevertheless, Quality argues that the six month time limitation for the express warranty bars plaintiffs' claims.

The basis for Quality's tender of the defense to Kevin Gros is the reciprocal indemnity language found in Section 7 of the Master Vendor Contract. In pertinent part, this part of the agreement states:

---

[1] A copy of this agreement is attached as Exhibit 1 hereto.
[2] See letters from counsel for Quality dated January 19, 2012 and February 1, 2012 respectively, attached hereto as Exhibits 2 and 3.

>Similarly, KG agrees to protect, defend, indemnify and hold harmless Contractor (Quality) its and/or their agents, directors officers, employees, servants and insurers ("Contractor Indemnitees") from and against any and all claims, demands, lawsuits and expenses, including court costs and attorneys' fees, lawsuits, administrative actions, arbitrations, penalties, fines, liabilities or causes of action of every kind and character, in favor of any person or party, for injury to or illness or death of any employees of KG and for any damage to property of KG … which injury, illness, death, employment related claim or damage arises out of, which may be alleged to have arisen out of or is incident to, directly or indirectly, the work performed and/or the services rendered under this contract, and regardless of the cause of such employment related claim, injury, illness or death, even though caused in whole or in part by a pre-existing defect, the negligence or strict liability of Contractor Indemnitiees or the unseaworthiness or unairworthiness of any vessel or aircraft or any other legal fault of Contractor Indemnitees.  KG will fully defend any such claim, demand or suit at its sole cost and expense, even if the same is groundless.

Quality's position is that since the suit alleges damage to the CAPT. WHITEY GROS, which was property of Kevin Gros, Kevin Gros must indemnify Quality against the claims asserted here.

The third significant portion of the Master Vendor Agreement is the insurance provisions found at Section 9.  Under these provisions, Quality agreed to provide certain insurance coverages.  In pertinent part, Section 9 states:

>A.   As a separate and distinct obligation … during the terms of this contract, Contractor agrees that it shall obtain and maintain … at Contractors' sole expense … the following policies of insurance of the types and with the minimum amounts as follows:
>
>>2.   Comprehensive General Liability Insurance:
>>
>>>2.1   Limits:
>>>
>>>a.   Comprehensive General Liability Insurance with minimum limits of  $1,000,000 for injury to or death or any person and $1,000,000 for any accident, and with minimum limits of $1,000,000 for property damage, each accident.
>>
>>5.   Umbrella liability coverage:

3

        a.        Contractor agrees to procure umbrella liability coverage of not less than $5,000,000 in excess of the coverages outlined above.

    6.    …

All policies required by this agreement shall be endorsed to waive subrogation against KG or any of the KG Indemnitees and shall name the KG Indemnitiees as an additional insured with no obligation for premiums and with deductibles to be solely for Contractor's account. Said policies shall also be endorsed **as primary** and shall delete any "other insurance" provisions or any "no cover elsewhere" or similar clauses, and any other insurance which is available to KG or KG Indemnitees shall be deemed excess to Contractor's insurance.

Kevin Gros now brings this motion to obtain a determination of: (a) whether Section 5 of the Master Vendor Agreement waived Kevin Gros' right to proceed based upon a breach of the implied warranty of workmanlike performance; and (b) whether the indemnity running in favor of Quality for damage to Kevin Gros' property is not triggered until Quality exhausts the $6 million in insurance it was obligated to provide under the Master Vendor Contract.

## ARGUMENT

A. **Summary judgment standard:**

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c) (West 1992); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). No genuine issue of material fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The instant motion, which seeks an interpretation of the Master Vendor Contract, raises issues of law and is therefore appropriate for disposition on Motion for Summary Judgment.

B.     **No waiver of the implied warranty of workmanlike performance:**

Section 5 of the Master Vendor Agreement declares that Quality will warrant its work for a period of six months. As this loss occurred more than six months after completion of the in-frame overhaul of the starboard main engine, Quality contends that Kevin Gros has no claim against it. However, as previously noted, Section 5 does not contain any waiver of implied warranties, nor the customary statement that the six month warranty is in lieu of all other warranties.

A brief discussion of the causes of action available to a vessel owner against a maritime service provider is perhaps in order. Judge Africk summarized them in *Marquette Transportation v. Louisiana Machinery,* 2002 WL 1809092 (E.D.La. 2002), rev'd on other grounds, 367 F.3d 390 (5th Cir. 2004) as follows:

> Under maritime law, "a shipowner may sue in either tort or contract for negligent repairs to his vessel." <u>La Esperanza de P.R., Inc. v. Perez y Cia de Puerto Rico, Inc.,</u> 124 F.3d 10, 16 (1st Cir.1997). The *La Esperanza* court explained:
>
>   A ship repairer potentially faces three sources of liability for repairs he performs improperly on a vessel. He may be liable in contract for a breach of his expressly assumed obligations or for a breach of an implied warranty of workmanlike performance that attaches to admiralty contracts under the rule of <u>Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.,</u> 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). A ship repairer may also be liable for the maritime tort of negligence. Importantly, negligence causes of action in admiralty invoke the principles of maritime negligence, not those of the common law. Moreover, while the implied warranty of workmanlike performance "parallel[s] a negligence standard rather than imposing [the] strict liability" that attaches to the implied warranties in land-based contracts under the Uniform Commercial Code ..., "a shipowner may receive indemnity from a marine contractor for breach of implied warranty of workmanlike serve, albeit that such performance was done without negligence." Finally, federally developed maritime law applies both when a court construes the terms of a repair contract and when it construes the standard of

performance due thereunder.  *La Esperanza,* 124 F.3d at 16-17 (internal citations omitted).

Tempered against these causes of action is the admonition of the Supreme Court in *East River S.S. Co. v. Transamerica Delaval,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), in which the Court held that actions for damage to a product under maritime law arise under contract law rather than under the law of product liability.  The Fifth Circuit has extended this doctrine to apply to the repair of an existing vessel.  *Employers Ins. of Wausau v. Suwanee River Spa Lines,* 866 F.2d 752 (5th Cir. 1989); *Nathaniel Shipping, Inc. v. General Electric Co.,* 932 F.2d 366 (5th Cir. 1991).  *Nathaniel* stands for two propositions:  first, that *East River* applies equally to new construction and existing vessels; and second, that *East River* precludes direct claims by a vessel owner against a subcontractor since it permits only contractual claims, and there is no privity of contract between an owner and a subcontractor of the contractor who agreed to perform the work.

*East River* also recognizes that by limiting claims to causes of action in warranty, the manufacturer is given the opportunity to restrict its liability with exculpatory clauses limiting the scope of its warranty.  Indeed, in many of the cases, the courts have enforced limitations on the scope of the warranty provided.  In *Employers Ins. of Wausau v. Suwannee River Spa Lines,* 866 F.2d 752 (5th Cir. 1989), the Court limited the construction supervisor's contract liability to $5 million as provided in the service agreement.  In *Nathaniel Shipping, Inc. v. General Electric,* General Electric was able to restrict its liability with limited liability language. 932 F.2d at 368.

However, here, Quality did not include in the Master Vendor Agreement any exculpatory clause disclaiming other warranties.   As a contract to perform repairs on an existing vessel, the Master Vendor Agreement was a maritime contract governed by maritime law.  *New Bedford*

6

*Dry Dock Co. v. Purdy,* 258 U.S. 96, 99-100, 42 S.Ct. 243, 66 L.Ed. 482 (1922); *Diamond Offshore Co. v. A&B Builders, Inc.,* 302 F.3d 531, 549 (5th Cir. 2002). In such contracts, the repairer implicitly warrants that he will perform in a workmanlike manner. *Lusich v. Bloomfield Steamship Co.,* 355 F.2d 770 (5th Cir. 1966); *Parfait v. Jahnke Service, Inc.,* 484 F.2d 296 (5th Cir. 1973), *cert. denied* 415 U.S. 957, 94 S.Ct. 1485, 39 L.Ed.2d 572 (1974). The holding in *East River* did not disturb the application of the warranty of workmanlike performance, nor limit the availability of this implied contractual remedy. *Ignazio Messina & C.S.P.A. v. Ocean Repair Service Co.,* 1993 WL 427443 at *5 (S.D.N.Y. 1993).

It has been universally recognized that the implied warranty of workmanlike performance will attach to all maritime services contracts unless **expressly** disclaimed. Indeed, in the Maritime Law Deskbook, the author writes that "a warranty of workmanlike performance is implied in every maritime repair and other maritime services contracts, unless the parties' agreement expressly excludes it." Charles M. Davis, Maritime Law Deskbook, at page 403 (Compass Publishing 2010); see, also, *Parfait v. Jahncke Service, Inc.*, 484 F.2d 296, 301 (5th Cir. 1973); *Kevin Gros Offshore, LLC v. Max Welders, Inc*. 2009 WL 152134, at *4; n.8; n.9 (E.D. La Jan. 22, 2009).

The case law supports the notion that the implied warranty must be expressly waived. *In McCross v. Ratnakar Shipping Co.*, 265 F.Supp. 827, 841 (D. Md. 1967), the Court held that in the context of a dispute between a ship and a stevedore prior to the 1972 amendments to the LHWCA that "federal maritime law controls, and all courts, federal and state, are required to enforce the implied warranty of indemnity [for workmanlike performance] from the stevedore to the ship in the absence of an **express waiver** by the ship. No such **express waiver** exists in any of the seven cases before the Court." *Id*. at 841 (emphasis added). In other contexts, the courts

have found that implied warranties may only be disclaimed by an express agreement to that effect. For example, in *Cullen Fuel Co. v. W.E. Hedger, Inc.,* 290 U.S. 82, 88 (1933), the Supreme Court indicated that the implied warranty of seaworthiness "is implied from the circumstances of the parties and the subject-matter of the contract and may be negative only by express covenant. It is as much a part of the contract as any express stipulation." In a more recent case from this district, the court indicated that the implied warranty of seaworthiness is subject to waiver by express language. See, *KAI Enterprises, L.L.C., v. Boh Bros. Const. Co., L.L.C.,*731 F.Supp.2d 568, 573 (E.D. La. 2010). The Fifth Circuit has held that the implied warranty of seaworthiness must be expressly waived. *Insurance Co. of North America v. Board of Commissioners,* 733 F.2d 1161 (5th Cir. 1984); see, also, *Austin & Aulemic, Inc. v. Servac Shipping Line,* 794 F.2d 941 (5th Cir. 1986).

Accordingly, since the Master Vendor Agreement does not expressly waive the implied warranty of workmanlike performance, the claims of Kevin Gros in this litigation remain viable despite the Master Vendor Agreement and *East River*. Judges in this district have recognized that unless this warranty is disclaimed, a vessel owner may invoke it against a ship repairer. *Caribbean Bulk Carriers, Ltd. v. Motor-Services Hugo Stamp, Inc.,* 1998 WL 210716 (E.D.La. 1998); *Statia Terminals, N.V. v. Huber, Inc.,* 1998 WL 560358 (E.D.La. 1998).

C. **The indemnity agreement contained in Section 7 of the Master Vendor Agreement is not triggered until the general liability insurance Quality agreed to provide is exhausted:**

The Master Vendor Agreement contains both indemnity and insurance provisions. Beginning with *Ogea v. Loffland Brothers Co.,* 622 F.2d 186 (5th Cir. 1980), the Fifth Circuit has consistently held that a party "who has entered into a contractual indemnity provision but who also names the indemnitor … as an additional insured under its liability policies, must first

8

exhaust the insurance it agreed to obtain before seeking contractual indemnity." *Tullier v. Halliburton Geophysical Services, Inc.,* 81 F.3d 552, 553 (5th Cir. 1996). See, also, *Klepac v. Champlin Petroleum Co.,* 842 F.2d 746 (5th Cir. 1988). Stated differently, the insurance provisions of a master service contract "trump" and take precedence over the indemnity terms to the extent of the insurance coverage required by the contract. A literal reading of *Ogea* and its progeny in this case would mean that until Quality exhausted the general liability coverage it agreed to provide in the Master Vendor Agreement, the indemnity would not apply.

*Ogea*'s mandate applies to vessel repair contracts. In *Marquette Transportation Company, Inc. v. Louisiana Machinery Company, Inc.,* 2002 WL 1809092 (E.D.La. 2002), *rev'd.* 367 F.3d 398 (5th Cir. 2004), Judge Africk was called upon to construe the effect of insurance and indemnity provisions in a maritime repair contract. In *Marquette,* the plaintiff contracted with Quality Shipyards (an affiliate of Tidewater Marine) to perform repairs to the M/V KAY ECKSTEIN. Marquette also contracted with Louisiana Machinery to overhaul the vessel's Caterpillar 3606 diesel engines (coincidentally the same engines at issue in this case). Among other things, Quality Shipyards was to drydock the vessel and perform modifications to its rudders, propellers and shafts. Only weeks after the work was completed, the engine room of the KAY caught fire, causing the sinking of the vessel. Marquette attributed the fire to the failure of Quality or Louisiana Machinery to properly tighten a flared fitting on the top and bottom of the main engine check valve.

Quality Shipyards filed a counterclaim, seeking indemnity and recovery of its attorneys' fees based upon Section 8(c) of the repair agreement. This provision required Marquette to defend, indemnify and hold Quality Shipyards harmless from any claim for loss or damage to property owned by Marquette. The repair contract also contained insurance provisions which

required Quality to maintain various insurance, including comprehensive general liability insurance. However, the agreement <u>did not require</u> Quality Shipyards to name Marquette as an <u>additional insured</u>, nor did it state that Quality Shipyards' insurance would be <u>primary</u> to all other insurance available to Marquette. Marquette argued that under *Ogea*, Quality Shipyards was first required to exhaust its general liability insurance before invoking the indemnity provision of Section 8(c).

Judge Africk recognized that under *Tullier,* the insurance procurement and indemnity provisions of the contract "must be read in conjunction with each other in order to properly interpret the meaning of the contract." He noted that *Tullier* found that the controlling fact was the "existence of "additional insured" coverage whereby an indemnitee agreed to procure insurance coverage for the benefit of the indemnitor". *Id.* at *17. He noted that the Marquette-Quality Shipyards contract did not require either party to name the other as an additional insured.

Judge Africk also recognized that under Judge Fallon's decision in *In re Diamond Services,* 2001 WL 531091 (E.D.La. 2001), *aff'd. without opinion,* 281 F.3d 1279 (5th Cir. 2001), primacy of insurance was a pivotal factor. In *Diamond Services,* Diamond entered into a dredging contract with Chet Morrison Contractors which contained reciprocal indemnity provisions. It also required Diamond to obtain general liability coverage, but did not require Diamond to name CMC as an additional insured in that policy. It required Diamond to obtain marine P&I insurance which named CMC as an additional insured; however, the P&I policy was not required to cover contractual liability. Diamond contended that CMC owed it indemnity in connection with the claim of a pipeline owner. Diamond contended that *Ogea* was inapplicable because the P&I policy *did not cover* CMC's indemnity obligation to Diamond (the P&I policy

10

did not contain contractual liability coverage), Diamond could invoke the indemnity before exhausting its own insurance.

Judge Fallon rejected Diamond's argument that coverage under the liability insurance provided by the indemnitee was dispositive. Nor did he agree that the existence of additional insured status was pivotal.[3] Rather, he reasoned that the pivotal factor was whether the P&I coverage provided by Diamond was primary. He held that "The essential fact is that the liability insurance provided to both Diamond and CMC under Diamond's policy is primary, and, therefore, before CMC is required to indemnify Diamond, the limits of the P&I policy must be exhausted. Once the policy limit is exhausted, the indemnity provisions of the MS contract come into effect." *Id.* at \*3.

Judge Africk interpreted Judge Fallon's opinion to mean that if a party was required to provide insurance covering a risk that could be incurred, that party could not invoke an indemnity provision until its insurance would be exhausted. He thus regarded "additional insured" or "primary" status as not being crucial to the question presented. In taking this "broader view," he held that Quality could not invoke the indemnity until its general liability coverage was exhausted.

The Fifth Circuit disagreed, re-affirming the *dicta* in *Tullier* and the holding in *Diamond Services,* by finding that Judge Africk's thinking was "appropriate in cases where the contracts contained "additional insured requirements <u>or</u> dictated the primacy of insurance coverage, or both." *Id.* at 407. However, that reasoning was inappropriate in *Marquette* because the repair contract did not require Quality Shipyards to name Marquette as an additional insured, and did

---

[3] In *Diamond,* Judge Fallon did not focus on the additional insured issue because there was an issue regarding whether the P&I policy covered Chet Morrison.

not state that Quality Shipyards' insurance was to be primary to any other insurance available to Marquette.

Here, the situation is clearly different. The Master Vendor Agreement requires at Section 9(A)(6) that Quality's insurance "name KG Indemnitees as an <u>additional insured</u>." It further required that Quality's policies be endorsed "<u>as primary</u>" and any insurance of the KG Indemnitees "shall be deemed excess to Contractor's insurance." Accordingly, these cases as a whole dictate that until Quality's general liability insurance is exhausted, the indemnity provision of the Master Vendor Agreement is not triggered.

It is anticipated that Quality and its insurer, Travelers, will argue that the critical factor under *Ogea* is whether the insurance provided by Quality **<u>covers</u>** the additional insured, here Kevin Gros, against the claims being asserted against it. Travelers will argue that its policy does not cover Kevin Gros' contractual indemnity obligation to Quality, and therefore *Ogea* is inapplicable. This argument has no merit. This same argument was presented to Judge Fallon in *Diamond Services*. There, it was argued that Diamond's P&I policy did not cover CMC's contractual liability to Diamond, and hence, *Ogea* was inapplicable. This was rejected by Judge Fallon, who found that if the contract dictated that the indemnitee's insurance was to be primary, that was sufficient to invoke *Ogea*. The same is true here, and therefore it is respectfully submitted that the indemnity contained in the Master Vendor Contract is not triggered until Quality's liability insurance is exhausted.

If coverage is the dispositive factor, the policy Quality agreed to make primary to any other insurance available to Kevin Gros, affords coverage to Quality for the allegations made against it. The policy, which appears in the record at R.Doc. 6-1, is a standard form comprehensive general liability policy. Like all such policies, it covered "all sums which the

12

insured shall become legally obligated to pay as damages because of "property damage." R.Doc. 6-1, at page 35. The policy broadly defined property damage to mean "physical damage to tangible property, including loss of use of that property." *Id.* at page 34. The policy contained the customary exclusions, which include the "care custody and control" (20(d)), the "sistership" exclusion (12), and the exclusion for property damage to the insured's "work (15). As the Fifth Circuit explained in *Todd Shipyards Corporation v. Turbine Services, Inc.,* 674 F.2d 401 (1982), these exclusions do not remove coverage for damage to an engine which occurs as a result of faulty repair. The "care, custody and control" exclusion is inapplicable to losses such as this one which occurs after the property has left the insured's custody. The "sistership" exclusion is inapplicable since it only applies to recalls of the insured's products. Finally, the "work" exclusion does eliminate coverage for the cost of replacing the insured's defective work, but does not exclude overall damage that the defective work caused to the entire engine. Here, the "work" exclusion would eliminate coverage for the cost of replacing the connecting rod bolts (a *de minimis* expense), but would not eliminate coverage for the other damage to the engine caused by the improper torquing of those bolts. It would not exclude coverage for the cost of repairing the fire damage, nor Kevin Gros' loss of use of the vessel.

    Accordingly, the Travelers/St. Paul policy does provide coverage for the losses asserted here. Even if coverage is the "trigger" for application of *Ogea,* which we submit it is not, that coverage trigger is also met in this case.

## CONCLUSION

    The warranty provisions contained in the Master Vendor Contract between Kevin Gros and Quality Diesel did not disclaim the warranty of workmanlike performance implied in all maritime service contracts. Accordingly, it is submitted that Kevin Gros may proceed under that

implied warranty eventhough this loss was not discovered within six months of the in-frame overhaul of the CAPT. WHITEY GROS' starboard main engine.

The contractual indemnity provision running in Quality Diesel's favor contained in the Master Vendor Contract does not apply in this case.  This is because Quality agreed to provide liability insurance which named Kevin Gros as an additional insured, and which dictated that Quality's insurance would be primary.  Accordingly, the indemnity obligation is not triggered until Quality's required insurance is exhausted.  As the amount of the claims asserted here is less than the $6 million in coverage Quality agreed to provide, the indemnity agreement does not apply to this case.

        Respectfully submitted,

        **WAITS, EMMETT & POPP**

        BY:s/John F. Emmett_____
            **JOHN F. EMMETT (La. 1861)**
            **RANDOLPH J. WAITS (La. 13157)**
            1515 Poydras Street, Suite 1950
            New Orleans, Louisiana  70112
            Telephone:  (504) 581-1301
            Facsimile:  (504) 585-1796
**Attorneys for Houston Casualty Company**

        **HARRIS & RUFTY**

        s/Christopher M. Ordoyne_____
        **RUFUS C. HARRIS, III (La. 6638)**
        **CHRISTOPHER M. ORDOYNE (La. 34014)**
        650 Poydras Street, Suite 2710
        New Orleans, LA 70130
        Telephone:  (504) 525-7500
        Fax:  (504) 525-7222
        Attorneys for Kevin Gros Marine, Inc.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing pleading has been forwarded to all counsel of record by placing same in the U.S. Mail, properly addressed and postage prepaid, or by filing same using the Court's CM/ECF system, on this 13th day of February 2012.

s/John F. Emmett