UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KEVIN GROS MARINE, INC., KEVIN GROS OFFSHORE, LLC and HOUSTON CASUALTY COMPANY | CIVIL ACTION<br><br>NO.:  2:11-CV-02340 |
| versus | SECTION: S (3) |
| QUALITY DIESEL SERVICE, INC. and TRAVELERS PROPERTY & CASUALTY INSURANCE COMPANY OF AMERICA | JUDGE MARY ANN VIAL LEMMON<br><br>MAG. DANIEL E. KNOWLES, III |

## MEMORANDUM IN SUPPORT OF MOTION FOR
## SUMMARY JUDGMENT ON WARRANTY CLAIMS

Quality Diesel Service, Inc. ("Quality Diesel"), respectfully submits that it is entitled to a partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Quality Diesel avers that Plaintiffs' claims for breach of implied warranty of workmanlike performance should be dismissed as a matter of law for two reasons: (1) the Express Warranty governing the alleged faulty work, which was provided to Kevin Gros Offshore, LLC and/or Kevin Gros Marine, Inc. (collectively referred to as "Kevin Gros"), by Quality Diesel explicitly excludes claims for breach of the implied warranty of workmanlike performance; and (2) in the alternative, Kevin Gros' conduct precludes it from recovering under the implied warranty of workmanlike performance. Accordingly, for the following reason, summary judgment should be granted in favor of Defendant, and against Plaintiff, dismissing all of Plaintiffs' claims with prejudice.

## I.    RELEVANT FACTUAL BACKGROUND.

### A.    THE EXPRESS WARRANTY.

At the inception of the business relationship between Quality Diesel and Kevin Gros in approximately 2004, Quality Diesel provided Kevin Gros with a copy of its express warranty.[1]    Prior to commencing any work, Quality Diesel initially required Kevin Gros to sign all work estimates and quotes, both of which also contained Quality Diesel's standard express warranty language.[2]    After several years, and many jobs later, Quality Diesel's relationship with Kevin Gros had developed into a comfortable and trustworthy one.

As a result, Quality Diesel began to relax some of the formalities that it required of Kevin Gros.[3]    Specifically, Quality Diesel no longer required that Kevin Gros sign each quote, nor did Kevin Gros require that Quality Diesel provide them with a formal quote for each job.[4]    Quality Diesel also discontinued providing Kevin Gros with copies of its Express Warranty.[5]

At the time of the June 2010 overhaul, Kevin Gros cannot deny that it was fully aware of the applicable terms of Quality Diesel's warranties.  Not only had there be many conversations about the warranties between the parties, there were also many instances where, despite not receiving a copy of the Express Warranty for a particular job, Kevin Gros requested – and Quality Diesel honored – Quality Diesel's Express Warranty on that job.[6]    On other jobs, Kevin Gros would request a repair and be told that the repair

[1] Affidavit of Jason Bourgeois at ¶ 7, attached hereto as Exhibit "A;" *see also* Warranty, attached hereto as Exhibit "B."
[2] An example of such a quotation is attached hereto as Exhibit "D."
[3] Affidavit of Jason Bourgeois at ¶ 9.
[4] *Id.*
[5] *Id.*
[6] *Id.* at ¶¶ 11, 12.

2870489_2.DOCX                    2

was out of warranty and that Kevin Gros would be charged for the work. Because the warranty was understood between the parties, there was no dispute or claim filed in those situations.[7]

The Express Warranty provides that all work done by Quality Diesel outside of its own facility (a.k.a., "field work"), is subject to a 6-month guarantee.[8] Also relevant to this motion, the Express Warranty also provides that the expressed warranties provided therein were Kevin Gros' "exclusive remedy" against Quality Diesel and that all other warranties provided by law were expressly waived:

> The warranties and guarantees set forth in this section are intended as the exclusive remedy of the Purchaser against Quality Diesel Service, Inc. for any guarantee deficiency or damages, whether in contract or in tort, or otherwise and/or in lieu of all implied warranties, included but not limited to any implied warranties of merchants ability, fitness for a particular purpose and workman-like services.[9]

Therefore, Quality Diesel expressly excluded all other express or implied warranties for its work, and Kevin Gros' own statements and actions clearly represented an agreement with those terms.

## B. THE MASTER VENDOR CONTRACT.

On or about February 1, 2009, Kevin Gros required Quality Diesel to execute a Master Vendor Contract ("MVC") in order for Quality Diesel to continue to enjoy Kevin Gros as a customer.[10]

Although the MVC further provides that it will trump any conflicting "work order," it does not provide that it supercedes any prior or currently enforceable contract

---

[7] *Id.* at ¶ 7.
[8] *See* Warranty, at p. 1, ¶ 2.
[9] *See* Warranty, at p. 2, ¶ 1. (emphasis added).
[10] *See* Affidavit of Jason Bourgeois, at ¶ 13; *see also* MVC, attached hereto as Exhibit "C."

and/or express warranty.[11]   Accordingly, both the MVC and the Express Warranty remained in force and effect during the overhaul in question.

### C.   THE JUNE 2010 OVERHAUL

In the Spring of 2010, Kevin Gros contacted Quality Diesel about performing an "in-frame overhaul" of its two main engines in the M/V CAPTAIN WHITEY GROS.[12] Prior to beginning the work, Jason Bourgeois of Quality Diesel met with Keith Bergeron, Jamie Troisclair and Keith Guidry of Kevin Gros to discuss the scope of the overhaul.[13] In that meeting, they discussed what needed to be done to the engine, what Kevin Gros wanted to be done, what parts should and should not be replaced, and the approximate cost.[14]   Additionally, given their concerns regarding the costs of the overhaul, Kevin Gros requested that Quality Diesel finance the cost of the work, to which Quality Diesel reluctantly agreed, based on their extensive work history together.[15] In an effort to save money, Kevin Gros instructed Quality Diesel to reuse many parts, including the original connecting rods.[16]

The "in-frame overhaul" took place onboard the CAPTAIN WHITEY GROS while it was docked at Bollinger Shipyards.[17]   In further efforts to keep costs down, Kevin Gros' Port Captains, Blaine Pellegrin and Keith Bergeron, were provided to supervise, assist, direct and in some cases perform some of the work Quality Diesel was hired to perform.[18]   Since Kevin Gros' Blaine Pellegrin was an experienced engine mechanic, he provided his own expertise and labor in the engine room in addition to

---

[11] *See* MVC at p.1, ¶ 1.
[12] Affidavit of Jason Bourgeois, at ¶ 16.
[13] *Id.* at ¶ 17.
[14] *Id.* at ¶ 18.
[15] *Id.* at ¶ 19.
[16] *Id.* at ¶ 20.
[17] *Id.* at ¶ 23.
[18] *Id.* at ¶ 24.

supervising and/or contributing to a large part of the overhaul.[19] In further control of the overhaul project, Kevin Gros declined certain work proposed by Quality Diesel.[20] The overhaul was completed on June 2, 2010, and the CAPTAIN WHITEY GROS performed successful sea trials on June 4, 2010.[21]

In line with the terms of the Express Warranty, Quality Diesel honored its 6-month warranty on several occasions for subsequent minor repairs to the main engines.[22] Moreover, a minimum of 13 additional repairs were required to the main engines after the 6-month warranty had expired.[23] In recognition that the warranty period had expired, Kevin Gros either paid for or has promised to pay for each of those repairs.[24] Additionally, despite Plaintiff's allegations as to causation, between the time of the overhaul and the time of the loss, Kevin Gros never complained about – nor did the starboard main engine ever exhibit – any indications or problems that are typically associated with improper torquing of connecting rod bolts (the alleged cause of the failure).[25]

Moreover, and presumably based on the extensive amount of damage alleged to the CAPTAIN WHITEY GROS, Kevin Gros abruptly changed its position and advised Quality Diesel that it intended to hold Quality Diesel responsible for the damages.[26] Thereafter, Quality Diesel responded by explaining that since its 6-month warranty had

---

[19] *Id.* at ¶ 25.
[20] *Id.* at ¶ 21.
[21] *Id.* at ¶ 26.
[22] *Id.* at ¶ 27.
[23] *Id.* at ¶ 28.
[24] *Id.*
[25] *Id.* at ¶ 29.
[26] *See* Letter from Capt. A.J. Cantrelle dated May 9, 2011, attached hereto as Exhibit "E."

expired, it was not liable for the loss.[27]  Houston Casualty Co., the subrogated insurer, countered by arguing – contrary to its insured's direct representations – to Quality Diesel that it believed that no express warranty applied to the overhaul, and thus, it would proceed against Quality Diesel under the implied warranty of workmanlike performance ("WWLP").[28]

Kevin Gros has filed a Motion for Partial Summary Judgment (Rec. Doc. No. 13) seeking a judgment from the Court that the MVC does not preclude its claims under the WWLP.  However, Kevin Gros fails to discuss the preclusion effect that the Express Warranty has upon their WWLP claim.  Accordingly, Kevin Gros' Motion should be denied, and a partial summary judgment should be entered in favor of Quality Diesel, precluding Plaintiffs' claims under the WWLP because such claims are barred by the clear terms of the Express Warranty.

## II.    LAW AND ARGUMENT

### A.    SUMMARY JUDGMENT STANDARD.

Summary Judgment under Federal Rule of Civil Procedure 56 is appropriate when "viewing the evidence in the light most favorable to the non-movant, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[29]  Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact.  "If the moving party meets the initial burden of

---

[27] *See* Letter from Jason Bourgeois dated May 11, 2011, attached hereto as Exhibit "F."  Quality Diesel attached an additional courtesy copy of the Express Warranty to its letter.

[28] *See* Letter from John Emmett dated June 15, 2011, attached hereto as Exhibit "G."

[29] *Levy v. Phillips and Jordan, Inc.*, 2011 WL 2580592, *2 (E.D. La. June 29, 2011) (Lemmon, J.) (quoting *Amburgey v. Corhart Refractories Corp.*, 9366 F.2d 805, 809 (5th Cir. 1991); Fed. R. Civ. Pro. 56(c).

establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial."[30]

The non-movant must demonstrate with "significant probative evidence" that there is an issue of material fact warranting a trial.[31]  The non-movant cannot satisfy its burden with "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."[32]  "Rule 56(c) mandates the entry of summary judgment against a party who has failed to make an evidentiary showing sufficient to establish an essential element of her case."[33]

### B.   THE EXPRESS WARRANTY EXPLICITLY EXCLUDES THE IMPLIED WARRANTY OF WORKMANLIKE PERFORMANCE.

The alleged loss in this case occurred more than 11 months after the June 2010 overhaul, well outside of the express six-month warranty provided to Kevin Gros by Quality Diesel.  Because of this, Plaintiffs have brought their claims under the WWLP. As set forth below, the Express Warranty that governs all of Quality Diesel's work for Kevin Gros contained an exclusionary clause expressly waiving the WWLP.  Therefore, Plaintiffs' claims for breach of the WWLP are barred, and summary judgment in favor of Defendants is warranted.

### 1.   THE IMPLIED WARRANTY OF WORKMANLIKE PERFORMANCE (WWLP).

Since the WWLP developed under the old regime of indemnification in maritime tort law, it has consequently fallen into disfavor since the Supreme Court's decision to

---

[30] *Id.* (citing *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (1986)).

[31] *Texas Manufactured Hous. Ass'n v. Nederland*, 101 F.3d 1095, 1099 (5th Cir. 1996), *cert denied*, 521 U.S. 1112 (1997).

[32] *Levy*, 2011 WL 2580592 at *2 (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[33] *Ward v. Bechtel Corp.*, 102 F.3d 199, 202 (5th Cir. 1997).

abandon indemnification and adopt a comparative fault principle in admiralty.[34]  This warranty states that the "obligor in a service contract has a duty to perform his or her task with reasonable care, skill, and diligence."[35]  If a contractor breaches its warranty, "and the breach proximately causes liability on the part of the shipowner, then the shipowner is entitled to indemnity unless its own conduct is 'sufficient to preclude indemnity.'"[36]

Judges in this District has noted that the WWLP "is on the verge of judicial extinction."[37]  Indeed, in *Kevin Gros Offshore*, Judge Feldman notes that "the Fifth Circuit has described the doctrine as 'withered' and has refused 'to extend the doctrine beyond those controversies involving the special rules governing the obligation and liability of shipowners which necessitated its formulation.'"[38]

Although the WWLP is implied in every maritime services contract, the parties are allowed to specifically exclude it.[39]  Additionally, Plaintiffs have acknowledged the validity of an express waiver of the WWLP, and argued in their motion that their claims are viable solely because no waiver exists in the MVC.[40]  Therefore, because the Express Warranty is applicable, and it contains an express waiver, there are no genuine issues of material fact as to whether Plaintiffs' claims under the WWLP are barred.

---

[34] *See Tidewater Marine, Inc. v. Sanco Intern., Inc.*, 1997 WL 543108, *9 (E.D. La., 1997) (Vance, J.).

[35] *B & B Schiffarhts GMBH & Co. v. Am. Diesel & Ship Repairs, Inc.*, 136 F. Supp.2d 590, 597 (E.D. La. 2001) (Barbier, J.) (quoting *Caribbean Bulk Carriers Ltd. v. Mortor-Services Hugo Stamp, Inc.*, 1996 WL 210716, *3 (E.D. La. Apr. 26, 1996)).

[36] *Parfait v. Jahncke Service, Inc.*, 484 F.2d 296, (5th Cir. 1973) (quoting *Weyerhaeser Steamship Co. v. Nacirema Operating Co.*, 355 U.S. 563, 567 (1958)).

[37] *Kevin Gros Offshore, LLC v. Max Welders, Inc.*, 2009 WL 152134, *4, n.8 (E.D. La. Jan. 22, 2009) (Feldman, J.); *Tidewater Marine, Inc. v. Sanco Intern., Inc.*, 1997 WL 543108 at *9.

[38] *Kevin Gros*, 2009 WL 152134 at *4, n.8.  (quoting *Nathaniel Shipping, Inc. v. Gen. Elec. Co.*, 920 F.2d 1256, 1264 (5th Cir. 1991)); *see also LCI Shipholdings, Inc. v. Muller Weingarten AG*, 2005 WL 2901908 (5th Cir. 2005) (citing cases doubting the continued vitality of the *Ryan* approach outside the personal injury context and noting that "because this case is outside the personal injury/seaworthiness context, we find no basis for the application of the theory of breach of a WWLP").

[39] *See Parfait, supra*; *ENSCO Marine Co. v. Bird-Johnson Co.*, 2004 WL 2984338 (E.D. La. Dec. 15, 2007) (Vance, J.).

[40] *See* Memorandum in Support of Motion for Partial Summary Judgment, pp. 6-8 (Rec. Doc. No. 13-1). Plaintiffs conspicuously ignore the Express Warranty.

**2.** **THE HISTORY OF BUSINESS DEALINGS MAKES THE EXPRESS WARRANTY APPLICABLE EVEN THOUGH IT WAS NOT PROVIDED TO KEVIN GROS SPECIFICALLY FOR THE OVERHAUL.**

It is anticipated that Kevin Gros will argue that the Express Warranty is inapplicable because a copy of the Express Warranty was not provided to Kevin Gros specifically for the overhaul. However, this argument is incorrect per controlling U.S. Fifth Circuit precedent.

**a.** **THE FIFTH CIRCUIT CREATED THE HISTORY OF BUSINESS DEALINGS TEST IN *CAMPBELL V. SONAT OFFSHORE DRILLING, INC.*[41]**

The case law in the U.S. Fifth Circuit holds that an express warranty between a vendor and its customer may be enforceable even when not actually provided to the customer, where the prior course of business dealings between the parties was such that the repetitious production of the express warranty was unnecessary.[42]

In *Campbell v. Sonat Offshore Drilling, Inc.*, the co-defendants disagreed about the applicability of a defense and indemnity agreement because the purchase order was issued to one defendant, Frank's, by the other defendant, UTP, thirteen days *after* the accident occurred.[43] The U.S. Fifth Circuit held that:

> [w]here parties share a history of business dealings and standardized provisions have become part of those dealings, such familiar provisions within purchase orders issued after performance are binding where they are accepted without objection.[44]

---

[41] 979 F.2d 1115 (5th Cir. 1992), *superceded by statute on other grounds.*

[42] *See, e.g., Campbell, supra.*

[43] *Campbell*, 979 F.2d at 1119.

[44] *Campbell*, 979 F.2d at 1120 (citing *Grillet v. Sears, Roebuck & Co.*, 927 F.2d 217, 220 (5th Cir. 1991) (stating that "[a] party cannot be permitted to retain the benefits received under a contract and at the same time escape the obligation imposed by the contract."), *superceded by statute, Oberg v. Allied Van Lines, Inc.*, 1992 WL 186098 (N.D. Ill. July 24, 1992); *see also M/V American Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1488-1489 (9th Cir. 1983) (in holding that standardized form of ship repair contract was enforceable even though executed after work was performed, recognizing that "it is a practice in the ship repair industry to do repair work before sending an invoice containing the contract for repairs"); *Hudson Waterways Corp. v. Coastal Marine Serv., Inc.*, 436 F.Supp. 597, 604-605 (E.D. Tex. 1977) (past

In applying its holding, the Fifth Circuit found that:

> (1) UTP and Frank's have conducted business on a regular, continuous basis for years, (2) it is common practice between UTP and Frank's for individual purchase orders to postdate the services rendered, (3) the basic indemnity language in these UTP-Frank's contracts has remained constant, and (4) as for the specific contract at issue, UTP paid Frank's in accordance with the contract's terms and Frank's accepted that payment without objection.[45]

Based on these findings, the Fifth Circuit upheld and enforced the alleged contract between Frank's and UTP.

### b. THE CASE LAW IN THE EASTERN DISTRICT SUPPORTS A FINDING THAT KEVIN GROS AND QUALITY DIESEL'S HISTORY OF BUSINESS DEALINGS SATISFIES THE TEST.

In order to apply the "history of business dealings" rule, the trial court must determine "whether the party defending the enforcement in fact expected that the usual terms would apply to its work."[46]  Additionally, there does not appear to be a bright-line rule governing the duration of time or the number of business dealings that are required before the *Campbell* rule applies.  The Eastern District of Louisiana has simply stated, "a *significant* course of dealings between parties who are aware from their prior dealings of liability limiting terms contained on an invoice may justify giving effect to the limitation of liability in subsequent dealings where the invoice is sent after performance."[47]

In *Hudson Waterways Corp. v. Coastal Marine Service, Inc.*, the court enforced a limitation of liability clause found on a repair contract despite the fact that the contract

business dealings provided sufficient notice to vessel owner that clause was implied in every repair contract)).

[45] *Id.* at 1119-1120.

[46] Flanagan, Harold J. and Bryan C. Reuter, *Purchase Order Contracts: A Whole Lot More Than You Bargained For?*, 46 LOY. L. REV. 365, 373 (Summer 2000).

[47] *B & B Schiffahrts*, 136 F. Supp.2d at 598 (emphasis added) (holding that three dealings in over two years was not significant enough); *c.f. Lykes Bros. S.S. Co. v. Waukesha Bearings Corp.*, 502 F. Supp. 1163, 1172-73 (E.D. La. 1980) (finding that nine dealings was sufficient to find a course of business dealings).

was sent to plaintiff *after* the repair work was done.[48]   The Court was "of the opinion that the plaintiff was on full notice that the clause was implied in every repair contract between the plaintiff and the defendant, ... because the custom in ship repair industry is to first do the repair work, and then send out the invoice which contains it on the contract."[49]   Between 1970 and 1975, defendant did 102 separate repair jobs for the plaintiff, and in each job, the invoice and contract were sent to the plaintiff after the work was completed.[50]   "The Court believes this is sufficient to put the Plaintiff on full notice that this clause was implied in every repair contract."[51]

In *Boston Old Colony Ins. Co. v. K&S Diesel Service, Inc.*, a case similar to ours, Judge Engelhardt denied summary judgment on a disputed issue of fact that is not present in this case.[52]   In January of 2002, Dawn Services entered into a verbal agreement with K&S Diesel for the purchase and installation of a replacement port main engine into Dawn's vessel.   In October of 2002, the port engine purchased from K&S Diesel broke down and failed, allegedly rendering the engine useless.[53]   Dawn's insurer filed suit to recover for all damages resulting from the engine failure.   Just as in this case, K&S Diesel responded that plaintiff's recovery was limited by a six-month warranty issued by K&S Diesel which had expired prior to the date of loss.[54]

K&S Diesel argued that the warranty information was provided to Dawn in every other prior contract between K&S Diesel and Dawn regarding the purchase and

---

[48] 436 F.Supp. 597 (E.D. Tex. 1977).
[49] *Id.* at 604.
[50] *Id.*
[51] *Id.* at 605.
[52] 2005 WL 840483 (E.D. La. April 8, 2005).
[53] *Id.* at *1.
[54] *Id.* at *5.

installation of several engines over the entities' <u>nine-year</u> business relationship.[55]  In

support of their argument, K&S Diesel submitted several un-sworn declarations from its

officers.  Plaintiff argued that the warranty was not binding because there had been no

showing of mutual consent to the terms and conditions of the warranty, and the language

appearing in a document issued at an indefinite time after the formation of the contract

cannot be enforced against them.[56]  Thus, Plaintiff argued that they were entitled to

pursue a breach of WWLP claim against K&S Diesel.

Judge Engelhardt's denial of K&S Diesel's motion was based solely on a finding

that it was still disputed whether K&S Diesel offered and provided Dawn with the

warranty information at the consummation of the verbal contract, and if so, when and

whether the warranty was accepted by Dawn. That dispute is not present in the instant

litigation. In fact, Judge Engelhardt stated that save that issue, K&S Diesel had presented

"strong evidence" showing that the warranty had expired and that it was likely that

Plaintiff was aware, through the course of its business dealings that the engine work was

out of warranty.

*K&S Diesel* is factually similar to our case in many respects: (1) QDS has sold

parts and performed services for Kevin Gros for more than seven years (which includes

more than 500 separate jobs);[57] (2) for the overhaul in question, no warranty was

provided to Kevin Gros at the time of the verbal agreement, but was provided very

shortly after the engine failed; and (3) the warranty was written in 2004 and has not been

modified.[58]  Additionally, Kevin Gros has been provided with the Express Warranty

---

[55] *Id.*

[56] *Id.*

[57] Affidavit of Jason Bourgeois, at ¶ 6.

[58] *Id.* at ¶ 8.

numerous times over the years and is well aware of its applicability on every job.[59] That fact cannot be disputed by Kevin Gros.

Unlike *K&S Diesel*, however, Quality Diesel submits a *sworn* affidavit from Jason Bourgeois, President of Quality Diesel.[60] Therein, Mr. Bourgeois attests to all relative facts that clearly set forth the facts and circumstances surrounding the history of business dealings with Kevin Gros (something that was not done in the *K&S Diesel* case). Furthermore, Mr. Bourgeois has been told on at least one occasion after the loss, by Kevin Gros' Port Captain Keith Bergeron, that they were fully aware of the terms of the Express Warranty and acknowledged that the Express Warranty had expired.[61] Given these circumstances and that no genuine issue of material fact is at issue, a partial summary judgment should be entered ruling that the Express Warranty was in full force and effect between the parties, and thus, Plaintiffs' claims under the WWLP should be dismissed, with prejudice.

## C.   As a Matter of Law, Kevin Gros' Own Conduct Bars any Claims Under the Implied Warranty of Workmanlike Performance.

As plaintiff, Kevin Gros has the burden of establishing (1) that Quality Diesel negligently performed the engine repair; and (2) a causal relationship between negligence and such damages.[62] Furthermore, because the WWLP has its roots in tort negligence, comparative fault principles also apply for maritime property damage claims.[63]

As noted *infra*, since the WWLP developed under the regime of indemnification in maritime tort law it has consequently fallen into disfavor since the Supreme Court's

---

[59] Affidavit of Jason Bourgeois, at ¶ 7, 8, 11 and 12.

[60] *See* Affidavit of Jason Bourgeois, attached hereto as Exhibit "A."

[61] *Id.* at ¶ 30.

[62] *Marquette Transp. Co., Inc. v. La. Machinery Co., Inc.*, No. 00-1504, 2002 WL 1809092, *14 (E.D. La. Aug. 7, 2002).

[63] *See ENSCO Marine Co.*, 2004 WL 2984338, at *8 (citing *Bosnor v. L.A. BARRIOS*, 796 F.2d 776 (5th Cir. 1986)).

decision to abandon indemnification and adopt a comparative fault principle in admiralty.[64] Since recognizing the comparative fault doctrine, the U.S. Fifth Circuit has eliminated virtually every variety of tort indemnity once available under maritime law and has discouraged the extension of the WWLP.[65] When determining whether to extend the WWLP, this Court has stated that the application of the warranty under the facts of a particular case rests upon the elements of expertise, control, supervision, and ability to prevent accidents.[66]

For example, a contractor's breach of the WWLP is excusable if the shipowner's conduct is "sufficient to preclude recovery of indemnity."[67] To determine whether the shipowner has engaged in conduct sufficient to preclude indemnity, "the conduct in question must be weighed against the contractor's breach of warranty under contract principles."[68]

In this case, the WWLP does not apply because Kevin Gros did not rely on the expertise of Quality Diesel. Rather, Kevin Gros mandated that the overhaul work in question be performed outside of Quality Diesel's own facility.[69] This decision by Kevin Gros affected the engine work by restricting Quality Diesel's access to certain tools and equipment which were only available in Quality Diesel's shop.[70] Kevin Gros also dictated the scope of the engine overhaul and selected which engine parts would be

---

[64] *Tidewater Marine, Inc.*, 1997 WL 543108 at *9 (citing *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975)).
[65] *Id.* (citing *Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 833 (5th Cir.1992)).
[66] *See Id.* (citing *Fairmont Shipping Corp. v. Chevron Intern. Oil Co., Inc.*, 511 F.2d 1252, 1257 (S.D.N.Y., 1975)).
[67] *See Weyerhaeuser Steamship Co. v. Nacirema Operating Co.*, 355 U.S. 563, 567 (1958).
[68] *Parfait*, 484 F.2d at 302 (citing *Waterman Steamship Corp. v. David*, 353 F.2d 660 (5th Cir. 1966)).
[69] Affidavit of Jason Bourgeois, at ¶ 23.
[70] *Id.*

replaced.[71]  Additionally, while the work was ongoing, Kevin Gros' port captains, Keith Bergeron and Blaine Pellegrin, supervised, directed, assisted in, and inspected the engine overhaul performed by Quality Diesel.[72]  Specifically, Pellegrin spent the majority of his time personally assisted Quality Diesel's mechanics in the engine room.[73]  Pellegrin, himself is an experienced diesel engine mechanic and contributed and often interjected his expertise into the overhaul, in such way that Quality Diesel was unable to exercise its own expertise or control over the work they were contracted to perform.[74]  In fact, during the overhaul, Kevin Gros specifically declined certain work proposed by Quality Diesel.[75]

Clearly, Kevin Gros did not rely on Quality Diesel's expertise with respect to the subject engine overhaul. Kevin Gros' involvement in the overhaul was to such an extent that they dictated which parts to replace, where the work was to be performed, and in some instances, how it was to be performed. Additionally, Kevin Gros' port captains spent a significant amount of time assisting supervising, in some cases, performing Quality Diesel's work. Consequently, Kevin Gros' own conduct precludes it from asserting any claims against Quality Diesel for breach of the WWLP as a matter of law. As such, Quality Diesel is entitled to a partial summary judgment dismissing Plaintiffs' claims under the implied warranty of workmanlike performance.

## III.    CONCLUSION

For the foregoing reasons set forth above, Quality Diesel respectfully requests that a partial summary judgment be entered on behalf of Quality Diesel and against Kevin

---

[71] *Id.* at 18, 20.
[72] *Id.* 24.
[73] *Id.* 25.
[74] *Id.*
[75] *Id.* at ¶ 21.

Gros, dismissing all claims asserted in the Complaint under the implied warranty of workmanlike performance, as a matter of law and with prejudice.

Respectfully submitted,

**KEAN MILLER LLP**

**BRADLEY J. SCHLOTTERER (#24211)**
**SEAN T. McLAUGHLIN (#31870)**
**TOD J. EVERAGE (#32445)**
909 Poydras Street, Suite 1400
New Orleans, LA 70112
Telephone: (504) 585-3050
Facsimile: (504) 585-3051
Email: brad.schlotterer@keanmiller.com
Email: sean.mclaughlin@keanmiller.com
Email: tod.everage@keanmiller.com
*Attorneys for Quality Diesel Service, Inc.*

=*and*=

**KENNETH J. GELPI, JR., T.A., (#24103)**
**RONALD J. KITTO (#28638)**
**A. GORDON GRANT, JR. (#6221)**
**MONTGOMERY BARNETT, L.L.P.**
3300 Energy Centre
1100 Poydras Street,
New Orleans, LA 70163
Telephone: (504) 585-3200
Facsimile (504) 585-7688
E-mail: kgelpi@monbar.com
       rkitto@monbar.com
       ggrant@monbar.com
*Attorneys for St. Paul Fire & Marine*
*Insurance Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of March, 2012, I electronically filed the foregoing with the Clerk of Court by using CM/ECF system which will send a notice of electronic filing to all counsel of record.

_____

**BRADLEY J. SCHLOTTERER**