# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KEVIN GROS MARINE, INC., KEVIN GROS OFFSHORE, LLC, AND HOUSTON CASUALTY COMPANY | CIVIL ACTION |
| VERSUS | NO: 11-2340 |
| QUALITY DIESEL SERVICE, INC., AND ST. PAUL FIRE & MARINE INSURANCE COMPANY | SECTION: "S" (3) |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that Kevin Gros Marine, Inc., Kevin Gros Offshore, LLC, and Houston Casualty Company's Motion for Partial Summary Judgment (Doc. # 13) is **GRANTED**. Plaintiffs' claim for breach of implied warranty of workmanlike performance is not precluded by the Master Vendor Contract.

**IT IS FURTHER ORDERED** that Quality Diesel Service, Inc.'s Motion for Summary Judgment on Hold Harmless Issues (Doc. # 16) is **DENIED**.

**IT IS FURTHER ORDERED** that Quality Diesel Service, Inc.'s Motion for Summary Judgment on Warranty Issues (Doc. # 17) is **DENIED**.

**IT IS FURTHER ORDERED** that Quality Diesel Service, Inc.'s Motion for Summary Judgment on Indemnity (Doc. # 18) is **DENIED**.

**BACKGROUND**

Plaintiffs, Kevin Gros Marine, Inc., Kevin Gros Offshore, LLC (collectively "Gros"), and Houston Casualty Company ("HCC"), Gros's hull insurer, filed this suit against defendants, Quality Diesel Service, Inc. ("Quality"), and Quality's insurer, St. Paul Fire and Marine Insurance Company ("St. Paul"), erroneously referred to as Travelers Property & Casualty Insurance Company of America, alleging claims of negligence and breach of implied warranty of workmanlike performance in connection with Quality's repair work to Gros's vessel, the M/V CAPTAIN WHITEY GROS.

Quality repairs and refurbishes diesel engines. Gros has contracted with Quality for repair services numerous times on diesel engines and vessels that Gros owns. On June 2, 2010, Quality performed an in-frame overhaul on the M/V CAPTAIN WHITEY GROS's starboard main engine, which included tightening connecting rods in the engine. On May 7, 2011, the M/V CAPTAIN WHITEY GROS was in transit when its starboard main engine ejected a connecting rod and fragmented piston out of both sides of the cylinder block. The ejections ignited a fire in the engine room and caused major engine damage. Gros filed a claim with HCC, its hull insurer. HCC paid the claim and became subrogated to Gros's rights against Quality and/or its insurer.

Quality claims that it gave Gros a copy of its warranty when it first began providing services to Gros in 2004. The warranty[1], dated August 1, 2004, states, in pertinent part:

> The warranties and guarantees set forth in this section are intended as the exclusive remedy of the Purchaser [Gros] against Quality Diesel Service, Inc. for any guarantee deficiency or damages, whether in contract or tort, or otherwise and/or in lieu of all implied

---

[1] Gros contends that it did not receive such warranty until seven years after the parties began doing business together.

warranties, included but not limited to any implied warranties of merchants ability, fitness for a particular purpose and workman-like services.

On February 1, 2009, prior to the M/V CAPTAIN WHITEY GROS's engine room fire, Gros and Quality entered into a Master Vendor Contract ("MVC"), which applied to all future work that Quality performed for Gros. The MVC provides, in pertinent part:

> 7. Indemnity
>
>       \*     \*     \*     \*
>
> Similarly, KG agrees to protect, defend, indemnify and hold harmless Contractor [Quality] its and/or their agents, directors, officers, employees, servants, and insurers ("Contractor Indemnitees") from and against any claims, demands, lawsuits and expenses, including court costs and attorneys' fees, lawsuits, administrative actions, arbitrations, penalties, fines, liabilities or causes of action of every kind and character, in favor of any person or party, for injury to or illness or death of any employees of KG and for any damage to property of KG and for any employment-related claims by employees of KG under any labor, civil rights, anti-discrimination and/or employment laws, which injury, illness, death, employment-related claim or damage arises out of, which may be alleged to have arisen out of or is incident to, directly or indirectly, the work performed and/or the services rendered under this contract, and regardless of the cause of such employment-related claim, injury, illness or death, even though caused in whole or in part by a pre-existing defect, the negligence or strict liability of Contractor Indemnitees or the unseaworthiness or unairworthiness of any vessel or aircraft or any other legal fault of Contractor Idemnitees. KG will fully defend any such claim, demand or suit at its sole cost and expense, even if the same is groundless.
>
>       \*     \*     \*     \*

> 9. Insurance
>
> * * * *
>
> 6. All insurance required by this contract shall be carried by a company or companies acceptable to KG. All policies shall be maintained in full force and effect during terms of any Work performed under the contract, and shall be endorsed to provide they cannot be cancelled, altered or amended without thirty (30) days prior written notice to KG.
>
> All policies required by this agreement shall be endorsed to waive subrogation against KG or any KG Indemnitees and shall name the KG Indemnitees as an additional insured with no obligation for premiums and with deductibles to be solely for Contractor's [Quality's] account. Said policies shall also be endorsed as primary and shall delete any "other insurance" provisions or any "no cover eleswhere" or similar clauses, and any other insurance which is available to KG or KG Indemnitees shall be deemed excess to Contractor's insurance.

The types of insurance required by the MVC were: (1) workers' compensation and employer's liability; (2) comprehensive general liability; (3) comprehensive automobile liability; (4) marine insurance; and, (5) umbrella liability coverage.

Plaintiffs, Gros and its insurer, HCC, filed this suit alleging that Quality caused the M/V CAPTAIN WHITEY GROS's engine room fire because it applied an improper amount of torque to the connecting rods during the in-frame engine overhaul. Plaintiffs filed a motion for partial summary judgment, requesting a ruling whether the MVC disclaimed the implied warranty of workmanlike performance, and whether Quality must exhaust any applicable insurance policies before availing itself of the MVC's indemnification provision.

Quality filed cross-motions for summary judgment on warranty and indemnity issues. Quality argues that its 2004 warranty expressly disclaims all implied warranties, including the

implied warranty of workmanlike performance. Also, Quality argues that it can invoke the MVC's indemnity provision because it obtained all required insurance coverage, and the policies do not cover Gros's loss. Quality also filed a motion for summary judgment on hold harmless issues, arguing that the MVC's hold harmless provision precludes any liability against Quality because the provision mandates that each party is solely responsible for damage to its own property caused by the other party.

## ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); FED. R. CIV. PROC. 56(c). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986). The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

## B. Marine Contract Interpretation

A contract to repair a vessel is a maritime contract. Alcoa S.S. Co. v. Charles Ferran & Co., 383 F.2d 46, 50 (5th Cir. 1967) (citing N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co., 39 S.Ct. 221 (1919)). Generally, courts apply federal common law to resolve maritime disputes. Albany Ins. Co.v. Anh Thi Kieu, 927 F.2d 882, 886 (5th Cir. 1991). When interpreting a maritime contract, the general rules of contract construction and interpretation apply. Marine Overseas Servs., Inc. v. Crossocean Shipping Co., Inc., 791 F.2d 1227, 1234 (5th Cir. 1986); Ogea v. Loffland Bros. Co., 622 F.2d 186 (5th Cir. 1980). Thus, each provision of a contract must be read in light of others so as to give each the meaning reflected by the contract as a whole. Southwestern Engineering Co. v. Cajun Elec. Power Co-op., Inc., 915 F.2d 972, 980 (5th Cir. 1990). Further, each provision of a contract must be given a meaning that renders it, along with all other provisions, effective rather than meaningless. See Lewis v. Hamilton, 652 So.2d 1327, 1330 (La. 1995). "[I]f a contract is clear and unambiguous, then it must be interpreted as written." Time Ins. Co. v. Estate of White, 447 Fed. Appx. 561, 564 (5th Cir. 2011) (citation omitted). "A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." Young v. Merrill Lynch & Co., 658 F.3d 436, 448 (5th Cir. 2011) (citation omitted). "Interpretation of the terms of a contract is a matter of law." Weathersby v. Conoco Oil Co., 752 F.2d 953, 956 (5th Cir. 1984).

The interpretation of a contractual indemnity provision in a maritime contract is generally a question of federal maritime law. Corbitt v. Diamond M. Drilling Co., 654 F.2d 329, 332 (5th Cir.

6

1981); Becker v. Tidewater, Inc., 586 F.3d 358, 369 (5th Cir. 2009). "A maritime contract containing an indemnity agreement, whether governed by federal maritime or Louisiana law, should be read as a whole and its words given their plain meaning unless the provision is ambiguous." Id.

**C. Warranty (Docs. # 13, 17)**

Gros and HCC seek a limited ruling on whether the MVC disclaims the implied warranty of workmanlike performance.

The warranty of workmanlike performance is implied in ship repair contracts. See Emp'rs Ins. of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 763 n.17 (5th Cir. 1989) (citing Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 76 S.Ct. 232, 237-38 (1956)). The ship repairer warrants that "the contractual services [will] be performed in a reasonably safe and workmanlike manner . . ." Lusich v. Bloomfield S.S. Co., 355 F.2d 770, 775 (5th Cir. 1966) (citing Ryan, 76 S.Ct. at 236-37). To recover for breach of the implied warranty of workmanlike performance, a plaintiff must show that: (1) the contractor did not perform his services in a reasonably safe and workmanlike manner; and, (2) his breach was the proximate cause of the damage. See Butterfly Transp. Corp. v. Bertucci Indus. Servs. LLC, 351 Fed. Appx. 855, 858 (5th Cir. 2009) (citation omitted). While the implied warranty of workmanlike performance may be disclaimed, such disclaimers are disfavored and strictly construed. Elgie & Co. v. S.S. "S.A. Nederburg", 599 F.2d 1177, 1183 (2nd Cir. 1979) (citation omitted).

Quality argues that Gros cannot assert a claim for breach of implied warranty of workmanlike performance because: (1) the 2004 warranty, which expressly disclaims all warranties, applies to the work in question; and, (2) Gros's actions during the work would prevent it from

7

prevailing on such a theory. Quality filed the affidavit of its President, Jason Bourgeois, in support of its argument that the 2004 warranty, which disclaims all implied warranties, trumps the MVC. Bourgeois declared that Quality has provided engine repair service to Gros for over seven years, that it gave Gros a copy of the warranty at the beginning of their business relationship, and that such warranty has governed all work between the parties. He also stated that Gros required Quality to execute the MVC to continue their business relationship. Bourgeois further declared that the 2004 warranty is still effective between the parties, the MVC does not void or supercede the warranty, and it is Quality's intent for the 2004 warranty to exclude all other express or implied warranties.

Bourgeois admits that Quality did not provide Gros with a copy of the warranty when it agreed to perform the work in question. Because the parties relaxed the formalities of business dealings with each other, Gros no longer required Quality to provide an estimate for each job, Quality no longer required Gros to accept its estimate for each job, and Quality stopped providing Gros with copies of the warranty for every job. Quality argues that it provided services to Gros since 2004, that Gros was fully aware of the disclaimer of implied warranties, and that their course of dealing demonstrates that the 2004 warranty applies to the work at issue.

Quality also argues that the implied warranty of workmanlike performance does not apply because Gros did not rely on Quality's expertise. Quality argues that because Gros mandated that the engine overhaul be performed outside of Quality's facility, Quality did not have access to certain tools and equipment needed to perform the engine overhaul. Quality states that Gros's employees, namely Port Captain Blaine Pellegrin ("Pellegrin"), assisted in the engine overhaul in such a way

8

as to prevent Quality from exercising its expertise and control over the repairs. Quality further argues that Gros prevented certain repairs to the vessel that Quality proposed.

Gros filed the declaration of its former Maintenance Supervisor, Keith Bergeron, to counter Bourgeois's affidavit. Bergeron worked for Gros from 2005 to 2010, and was principally responsible, along with Pellegrin, for Gros's dealings with Quality. Bergeron declared that in his five years of employment with Gros, he did not see the 2004 warranty until after the M/V CAPTAIN WHITEY GROS's engine room fire and that Gros's records show that it did not receive the 2004 warranty until after the fire. Bergeron further declared that there were no discussions regarding what warranty would cover the engine overhaul, and that the only written warranty that Gros agreed to was the warranty contained in the MVC.

The MVC is a ship repair contract, and therefore has an implied warranty of workmanlike performance. The MVC's warranty provision does not disclaim any implied warranties. Thus, the MVC does not preclude plaintiffs' from asserting a claim for breach of implied warranty of workmanlike performance. Therefore, plaintiffs' motion for partial summary judgment is GRANTED.[2]

With respect to Quality's cross-motion for summary judgment, genuine issues of material fact exist regarding whether the MVC's warranty provision or the 2004 warranty is applicable, and whether plaintiffs can prevail on a theory of implied warranty of workmanlike performance if the

---

[2] This ruling only addresses whether a claim for breach of implied warranty for workmanlike performance is precluded by the MVC. The ruling does not address whether the MVC or the 2004 warranty applies to this claim, nor does it address the merits of plaintiffs' claim for breach of implied warranty of workmanlike performance.

MVC's warranty provision applies. Thus, Quality's cross-motion for summary judgment is DENIED.

**D. Indemnity (Docs. # 13, 18)**

Plaintiffs argue that the MVC's indemnity provision does not apply to Quality until Quality exhausts the applicable insurance coverage it agreed to obtain under the MVC. Specifically, they argue that, because the MVC required Quality to name Gros as an additional insured on all insurance policies and that the policies be primary, Quality must exhaust the insurance coverage before availing itself of the indemnity provision. In so arguing, plaintiffs concede that they do not seek coverage as an additional insured under the St. Paul policy and are not asserting a first-party property claim. Rather, their claim against St. Paul is in its capacity as Quality's insurer and is therefore a third-party claim.

Quality argues that because plaintiffs do not seek coverage as an additional assured, Quality is not required to exhaust any insurance proceeds before seeking indemnification. Quality further argues that the M/V CAPTAIN WHITEY GROS's damage is not covered by any of the insurance policies required under the MVC, and the plain language of the MVC's indemnification provision mandates that Gros indemnify Quality and St. Paul for any damage to Gros's property.[3]

---

[3] Quality also filed a motion for summary judgment arguing that paragraph 7 of the MVC is a "hold harmless" provision by which Gros agreed to release Quality from certain types of liability, including property damage. (Doc. # 16). Paragraph 7 of the MVC provides, in pertinent part, "KG agrees to protect, defend, indemnify and hold harmless Contractor [Quality] . . . " Black's Law Dictionary defines "hold harmless" as "[t]o absolve (another party) from any responsibility for damage or other liability arising from the transaction; indemnify." Black's Law Dictionary 800 (9th ed. 2009). Black's Law Dictionary also states that "indemnify" means "[t]o reimburse (another) for a loss suffered because of a third party's or one's own act or default; hold harmless." Id. at 837. Thus, this provision in paragraph 7 clearly anticipates an indemnity agreement, and "hold harmless" is synonymous with "indemnify."

In Marquette Transportation Co. v. Louisiana Machinery Co., 367 F.3d 398 (5th Cir. 2004), the United States Court of Appeals for the Fifth Circuit considered the issue whether insurance coverage must be exhausted prior to the invocation of an indemnity agreement. In Marquette, Louisiana Machinery and Quality Shipyards, Inc., performed engine overhauls and other repairs to Marquette Transportation Company's vessel, the M/V KAY ECKSTEIN. Prior to the repairs, the parties entered into a contract that contained an indemnification provision[4] and required each party to obtain specified insurance policies. Five weeks after the repairs, the M/V KAY ECKSTEIN's engine room caught on fire and the vessel sank. Louisiana Machinery and Quality Shipyards argued that the indemnification clause provided that Marquette was responsible for the fees they incurred in defending the suit. The United States Court of the Appeals for the Fifth Circuit found in favor of Louisiana Machinery and Quality Shipyards, holding that the contract did not "dictate that the required insurance would provide primary coverage before indemnification." Marquette, 367 F.3d at 409.

In so holding, the court relied on Ogea v. Loffland Bros. Co., 622 F.2d 186 (5th Cir. 1980), Tullier v. Halliburton Geophysical Servs., 81 F.3d 552 (5th Cir. 1996), and In re Diamond Services, 2001 WL 531091, (E.D. La. 5/16/01), aff'd, 281 F.3d 1279. In Ogea, 622 F.2d at 187-88, and

---

[4] The indemnification clause in Marquette provided that:

> "Each party agrees to defend, indemnify and hold harmless the other party's Indemnitees free and harmless from and against any and all suits, claims, or liabilities (including, without limitations, the cost of defending any suit and reasonable attorney's fees) for loss or damage to property owned, leased or operated by indemnitor, regardless of cause, including the negligence or other legal fault of any of each party's Indemnitees."

367 F.3d at 405.

Tullier, 81 F.3d at 552-553, the parties entered into contracts that contained indemnification provisions and required the parties to obtain comprehensive general liability insurance policies that named each other as an additional insured. In Diamond Services, 2001 WL 531091, *1, the contract required Diamond to obtain a protection and indemnity ("P & I") insurance policy naming Chet Morrison Contractors as an additional insured, and mandated that such policy be primary. The court in Diamond Services, 2001 WL 531091, *3, observed that "[t]here is no reason for an indemnitor to require an indemnitee to procure insurance if the indemnitor did not intend to limit its indemnification obligations to the excess of the required insurance coverage." Thus, the court held that because the liability insurance under the P & I policy was primary, it was required to be exhausted before the indemnification obligation came into effect.

In Marquette, 367 F.3d at 406, the court noted that Ogea, Tullier, and Diamond Services all held that "the insurance policies were the 'primary payers' and should be exhausted before any indemnity obligations attached." Further, the court stated that "in cases like Ogea, Tullier, and Diamond Services, *where the contracts contained 'additional insured' requirements or dictated the primacy of insurance coverage over indemnification obligations, or both*," the parties intended that the insurance coverage be exhausted prior to the indemnity provisions being triggered. Id. at 407 (emphasis added). The court concluded by distinguishing Marquette from Ogea and its progeny by stating that the contract at issue in Marquette did not require the parties to name each other as additional insureds, nor did it state that the insurance policies would provide primary coverage. Id. at 409. Thus, Louisiana Machinery and Quality Shipyards were entitled to indemnification from Marquette for fees incurred in defending the suit without exhaustion of the insurance policies. Id.

In the present case, the MVC: (1) contains an indemnification provision; (2) requires both Quality and Gros to obtain specific insurance policies and name the other party as an additional insured; and, (3) states that the required insurance is primary to all other insurance provisions or similar clauses. Thus, the MVC is the type of contract that requires that the insurance policies be exhausted before a party seeks indemnification, and Quality is required to exhaust the applicable insurance coverage before seeking indemnification from Gros. Marquette, 367 F.3d at 407. Therefore, plaintiffs' motion for summary judgment seeking a determination of whether Quality must exhaust its applicable insurance policies before seeking indemnification is GRANTED, and Quality's cross-motion for summary judgment on indemnity is DENIED.[5]

## CONCLUSION

**IT IS HEREBY ORDERED** that Kevin Gros Marine, Inc., Kevin Gros Offshore, LLC, and Houston Casualty Company's Motion for Partial Summary Judgment (Doc. # 13) is **GRANTED**. Plaintiffs' claim for breach of implied warranty of workmanlike performance is not precluded by the Master Vendor Contract.

**IT IS FURTHER ORDERED** that Quality Diesel Service, Inc.'s Motion for Summary Judgment on Hold Harmless Issues (Doc. # 16) is **DENIED**.

**IT IS FURTHER ORDERED** that Quality Diesel Service, Inc.'s Motion for Summary Judgment on Warranty Issues (Doc. # 17) is **DENIED**.

---

[5] These rulings are limited in scope to the issue before the court, i.e. whether Quality must exhaust any applicable insurance policy before seeking indemnification. The rulings do not address whether the M/V CAPTAIN WHITEY GROS's damage is covered by any policy required by the MVC. Further, this ruling does not address any defenses St. Paul might have because St. Paul is not a party to the motions before the court.

**IT IS FURTHER ORDERED** that Quality Diesel Service, Inc.'s Motion for Summary Judgment on Indemnity (Doc. # 18) is **DENIED**.

New Orleans, Louisiana, this  30th  day of May, 2012.

**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**