**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**KEVIN GROS MARINE, INC.,**                          **CIVIL ACTION**
**KEVIN GROS OFFSHORE, LLC**
**AND HOUSTON CASUALTY**
**COMPANY**

**VERSUS**                                             **NO:  11-2340**

**QUALITY DIESEL SERVICE, INC.**                       **SECTION: "S" (3)**
**AND TRAVELERS PROPERTY &**
**CASUALTY INSURANCE**
**COMPANY OF AMERICA**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs, Kevin Gros Marine, Inc., Kevin Gros Offshore, LLC (collectively "Gros"), and

Houston Casualty Company ("HCC"), Gros's hull insurer, filed this suit against defendants, Quality

Diesel Service, Inc. ("Quality"), and Quality's insurer, St. Paul Fire and Marine Insurance Company

("St. Paul"), alleging claims of negligence and breach of implied warranty of workmanlike

performance in connection with Quality's repair work on the starboard main engine, a Caterpillar

3606, on Gros's vessel, the M/V CAPTAIN WHITEY GROS. HCC[1] seeks reimbursement from

Quality of $1,851,338.28, and Gros seeks reimbursement of $50,000 for its insurance deductible.

Quality maintains that HCC did not meet its burden of proof.  Quality argues that it does not

owe anything to HCC or Gros, and that they owe it attorneys' fees and costs under the terms of the

Master Vendor Agreement ("MVA") signed by the parties on February 1, 2009, which applied to

all future work Quality performed for Gros.

---

[1] HCC paid Gros's insurance claim prior to trial, and Gros assigned its rights against Quality to HCC. Gros's sole remaining interest in the suit at the time of trial was reimbursement for the $50,000 insurance deductible that it paid.

The case was tried as a bench trial, and memoranda supporting the parties' respective positions were submitted to the court.

## DISCUSSION

### A.   Background

Quality repairs and refurbishes diesel engines.  Gros has contracted with Quality for repair services numerous times on vessel diesel engines that Gros owns. On June 2, 2010, Quality performed repair work on the M/V CAPTAIN WHITEY GROS's starboard and port main engines, Caterpillar 3606 engines, which included tightening connecting rod bolts in the engines.  Eleven months later, on May 7, 2011, the M/V CAPTAIN WHITEY GROS was in transit when its starboard main engine ejected the number three connecting rod and fragmented piston out of the side of the cylinder block.  Simultaneously, there was a fire in the engine room that caused major damage.[2]  Gros filed a claim with HCC, its hull insurer.  HCC paid the claim under the hull insurance policy's Inchmaree Clause, which covers repairer's negligence, and became subrogated to Gros's rights against Quality and/or Quality's insurer, except for the $50,000 insurance deductible paid by Gros.

Gros and HCC, filed this suit alleging that Quality breached the implied warranty of workmanlike performance by applying an improper amount of torque to the bolts on the number

---

[2] There is no direct evidence regarding whether the fire or the ejection of the connecting rod occurred first, or whether the ejection of the connecting rod caused the fire.  There were no eyewitnesses and neither party offered an opinion from a fire and origin expert.

three connecting rod during the in-frame overhaul of the starboard main engine, and that the ejection of the connecting rod and fragmented piston ignited the engine room fire.[3]

**B.       The Implied Warranty of Workmanlike Performance**

The warranty of workmanlike performance is implied in ship repair contracts. See Emp'rs Ins. of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 763 n.17 (5th Cir. 1989) (citing Ryan Stevedoring Co. v. Pan-Atl. S.S. Corp., 76 S.Ct. 232, 237-38 (1956)).  It means that "the obligor in a service contract has a duty to perform his or her task with reasonable care, skill, and diligence.  Thus, the [warranty of workmanlike performance] is a legal 'construct' that was originally rooted in the concept of *negligence.*" 1 THOMAS J. SHOENBAUM, ADMIRALTY & THE GENERAL MARITIME LAW, § 5-5 at 190 (2d ed. 1994) (emphasis in original).  To recover for breach of the implied warranty of workmanlike performance, a plaintiff must show, by a preponderance of the evidence, that: (1) the contractor breached the warranty; and, (2) his breach was the proximate cause of the damage. See Butterfly Transp. Corp. v. Bertucci Indus. Servs. LLC, 351 Fed. Appx. 855, 858 (5th Cir. 2009) (citation omitted); see also Marquette Transp. Co., Inc. v. La. Mach. Co. Inc., 367 F.3d 398, 402 (5th Cir. 2004).  In Marquette Transp., 367 F.3d at 402, the United States Court of Appeals for the Fifth Circuit noted that when a fire is involved, breach and causation "frequently must be established by circumstantial evidence because of the fire's destruction of the physical

_____

[3] HCC filed a motion for partial summary judgment regarding the applicability of the implied warranty of workmanlike performance.  The court found that HCC could pursue such a claim under the MVC between the parties, but that there were disputed issues of material fact precluded a finding of whether the MVC or a 2004 warranty that disclaimed the implied warranty of workmanlike performance controlled. Quality did not argue or present any evidence at trial to prove that the 2004 warranty controlled.  Indeed, Quality focused on demonstrating that HCC did not meet its burden of proving that Quality breached the implied warranty of workmanlike performance.  Therefore, the court will assume that the implied warranty of workmanlike performance was applicable.

evidence," but that "the evidence available must be *sufficient* to find *both* negligence and causation." (emphasis in original).

### 1. Breach of the Warranty of Workmanlike Performance

In this case, to find breach of the warranty of workmanlike performance, i.e. negligence, the court must determine that "it is more probable than not that" the bolts on the number three connecting rod were under-torqued when the M/V CAPTAIN WHITEY GROS left the shipyard after Quality performed work on the starboard main engine in June 2010. See id.

HCC contends that the bolts on the number three connecting rod in the starboard main engine must have been under-torqued when the M/V CAPTAIN WHITEY GROS left the shipyard in June 2010, because Rodney Barras, the Quality technician in charge of the job who torqued the bolts, used an outdated method to torque the connecting rod bolts. HCC's experts, Andrew Minster and Dr. Courtney Busch opined that improperly torqued connecting rod bolts were the cause of the ejection of the connecting rod and fragmented piston from the engine block. HCC also argues that there is no other explanation for the occurrence.

Quality contends that HCC did not meet its burden of proof regarding negligence because HCC did not prove that it is more likely than not that the bolts on the number three connecting rod were under-torqued when the M/V CAPTAIN WHITEY GROS left the shipyard in June 2010. Quality argues that Barras' testimony demonstrates that all of the connecting rod bolts in both engines were torqued using the same Caterpillar approved procedure, which Barras and his boss, Jason Bourgeois, have used for years without any resulting problems related to under-torqued connecting rod bolts. Quality also contends that the testimony of Jason Bourgeois, Jay Webster, Dr.

William Arnoult, Herman Williams and Captain Stephen Littlefield demonstrate that under-torqued connecting rod bolts were not the cause of the casualty.

### a.  Rodney Barras

At trial, Barras, a Quality employee, testified that he has nineteen years of experience as a diesel engine mechanic, and that he received his training on the job.  He was the lead mechanic on the work at issue.  The job was a repair, not an overhaul, because more parts are replaced in an overhaul than were replaced in this instance.  Because Gros was concerned with costs, it insisted that many parts be reused and provided its own employees, Blaine Pelligrin and Keith Bergeron, to assist with the work.

Barras and another Quality employee torqued all of the connecting rod bolts in both engines. Barras did not measure the bolts to determine whether there was stretch in the bolts before reusing them, and did not know that they should have been measured, but he did visually inspect them and did not see any defects. He also reused the nuts. Gros did not request that these parts be changed, and Barras knew that Gros wanted to save money.  Barras testified that he used a Caterpillar approved method to torque the connecting rod bolts in a clockwise pattern to an initial seating torque of 220, plus or minus 22 foot pounds, and then turned the nuts clockwise 180, plus or minus five degrees.  Barras used engine oil  as lubricant.  Barras has used this procedure hundreds of times in the past and there have never been any problems with under-torqued or under-lubricated bolts, nor with reusing nuts and bolts.

Barras was present for the fourteen hour sea trials on the M/V CAPTAIN WHITEY GROS. He did not hear or see anything indicating that any connecting rod bolts were under-torqued. Further, Barras testified that he has previously witnessed an engine fail because of under-torqued

connecting rod bolts.  There is knocking and vibration prior to the failure, and it will likely occur during the sea trials. Barras testified that the connecting rod bolts would have "mushrooming" and would be shiny if they had been under-torqued. The connecting rod bolts at issue did not show such signs and had the original manufacturing machining marks, which indicate that they were not under-torqued.

At trial, Barras admitted that the procedure he used for torquing the connecting rod bolts had been updated by Caterpillar.  He reviewed the Caterpillar procedure for tightening the connecting rod bolts that was in force in June 2010.  The update advised not to reuse the nuts, not to reuse the rod bolts if they did not meet certain measurement requirements, and to use Molylube Anti-Seize Lubricant to lubricate the treads of the bolts, nuts and seating face of the nuts.  The procedure instructs the mechanic to tighten the nuts in a cris-cross pattern to an initial seating torque of 277, plus or minus 11 foot pounds, and then to turn the nuts clockwise an additional 180, plus or minus 5 degrees.  Barras testified that Quality does not receive updates from Caterpillar, but that the updates are available online.  He did not check the updates before performing the work in question.

Barras testified that the M/V CAPTAIN WHITEY GROS's engines were in horrible condition and that the oilers and engineers never cleaned them up.  He testified that he knew of two previous fires on the M/V CAPTAIN WHITEY GROS, one caused by an exhaust leak, and the other by faulty wiring.

Barras viewed a photograph of the engine with the air flap tied off with a wire.  Barras testified that the air flap is a failsafe that prevents the engine from overspeeding by shutting it down. Barras testified that a Quality employee would not be authorized to tie off the air flap, and would be fired "on the spot" for doing so because disabling the shutdown system will allow the engine to

overspeed until it fails.  Barras was not informed of any episodes of overspeeding on the M/V CAPTAIN WHITEY GROS's starboard main engine, but he acknowledged that overspeeding is bad for all of the engine's parts and causes uneven wear and loads on the engine.

Barras testified that he saw the engine's parts after the casualty.  He does not believe that the casualty was caused by lack of lubrication, an exhaust system problem, or the temporary governor wiring repair that occurred on the previous day.

### b.  Jason Bourgeois

Jason Bourgeois, the president of Quality, has been a diesel engine mechanic for over twenty years.  He was trained and certified by Caterpillar at their corporate headquarters, and he has torqued the connecting rod bolts on Caterpillar 3600 series engines hundreds of times using the procedure Barras used on this job in June 2010.  Bourgeois has never had any issue with under-torqued connecting rod bolts as a result of using this connecting rod bolt torquing procedure.  Bourgeois testified that the torquing procedure used on the connecting rod bolts during the work on the engines on the M/V CAPTAIN WHITEY GROS in June 2010, was in effect for 17 years, and that there have been minor modifications in recent years, including the procedure that HCC claims should have been used.  Bourgeois also testified that the version HCC claims should have been used has been updated by Caterpillar and is now obsolete.  Bourgeois testified that the difference in the amount of torque referenced in the two procedures at issue is "negligible," and that the final torque after the 180 degree turn is unknown.

Bourgeois also testified that over the last ten years, he and Barras have torqued each of the connecting rod bolts in the M/V CAPTAIN WHITEY GROS's starboard main engine at least three times using the same torquing procedure that was used in June 2010, and there have never been any

problems due to under-torqued connecting rod bolts. Bourgeois testified that he has no explanation of why only one connecting rod bolt would be loose if the same procedure was used to torque all of the connecting rod bolts, or why it would take eleven months for the failure to occur.

Bourgeois testified that Gros was concerned with controlling the cost of the work done to the M/V CAPTAIN WHITEY GROS's engines in June 2010.  Gros provided two of its own employees to help with the work.  Also, the work performed on the M/V CAPTAIN WHITEY GROS's engines in June 2010 was actually a repair job, not an overhaul.  An overhaul is a total replacement of the parts, and in this case, many parts were reused at Gros's request.  Quality did not recommend changing the connecting rods and bolts because they were visually inspected and appeared sound.  Quality did recommend repairs to the engine exhausts, which were causing fires and burnt wiring in the engine room, but Gros rejected the recommendation due to the costs. Further, Quality recommended fixing the engine gauges that inform the engineers how the engine is performing, but Gros refused that recommendation also.

Bourgeois took photographs of the M/V WHITEY GROS's starboard main engine after the failure.  He noted that one of the air flaps appeared to be tied off with a wire to disable it.  Bourgeois testified that the air flap is the last resort to shut down the engine to prevent an overspeed. Bypassing the shutdown would allow the engine to overspeed and surge without shutting down.  He testified that tying off the bypass is not a Caterpillar approved procedure, and any overspeeding problem should have been repaired. The M/V CAPTAIN WHITEY GROS's rough vessel log showed that Gros acknowledged the problem and instructed the mechanics to bypass the failure, thus impeding the engine's ability to protect itself.

8

Bourgeois testified that a service report of June 24, 2010, indicated that the M/V CAPTAIN WHITEY GROS's starboard main engine was surging, and that problem was addressed by Gros on July 10, 2010.

Bourgeois testified that he examined the engine's parts after the casualty.  He did not see any evidence that the engine ran away or oversped, or that there was improper maintenance or lubrication.

### c.  Robert Hall

Robert Hall has been a Caterpillar customer service engineer for the 3600 series of engines for thirty years.  Hall has worked as a diesel mechanic and has done repair work on the 3600 series engines, including installing connecting rod bolts.

Hall reviewed Caterpillar "Engine News" publications at his deposition.  "Engine News" is a Caterpillar publication intended to provide Caterpillar dealers with "latest and greatest news of any product changes or procedure changes."  An engine repairer that is not an authorized Caterpillar repair shop would not have access to "Engine News," but the mechanic could call a Caterpillar dealer to find out about any pertinent changes.

Hall testified that the guidelines for reuse of connecting rod nuts and bolts in effect in June 2010 instructed the mechanic not to reuse the nuts, and to inspect the connecting rod bolts at each surface of the bearing to ensure that there was no fretting on the shank of the connecting rod bolt, including the knurled area, and to ensure that the connecting rod bolts meet the guidelines for reusable parts.  The mechanic is instructed not to reuse the connecting rod bolts if the length of the bolt is more than 329 millimeters.  The procedure called for the use of Molylube Anti-Seize Lubricant, and the bolts were to be torqued in a cris-cross pattern to an initial seating torque of 375,

plus or minus 15 Newton meters, and then the nuts were to be turned clockwise an additional 180, plus or minus 5 degrees.[4]  Hall did not know what the final amount of torque on the bolts would be after the 180 degree turn.  Hall testified that oil sampling can help detect problems with the engine in some cases.  Gros did not perform this oil sampling on the M/V CAPTAIN WHITEY GROS's engines.

### d.  Herman Williams

Herman Williams was the chief engineer aboard the M/V CAPTAIN WHITEY GROS. Williams began working for Gros on August 21, 2009.  He worked on three other vessels before becoming the chief engineer on the M/V CAPTAIN WHITEY GROS in January 2011, at the request of the vessel's captain, Stephen Littlefield.  Williams testified that the M/V CAPTAIN WHITEY GROS had a reputation of having fires, lots of problems with the engines and pumps, and not being a well maintained vessel.  Williams testified that he discovered that the reputation was "very accurate."  Williams read an entry from the vessels rough log dated July 23, 2010, which predated his tenure on he vessel, but testified that it accurately described his experience on the M/V CAPTAIN WHITEY GROS:

> Number 3 generator does not have a sight glass on expansion tank and has never had one on there due to the crew that has been working this boat for three years has been very lax and lazy about taking care of vessel equipment; no nalcool, no cleaning, oil leaks everywhere, pressure gauges that don't work; expansion tank sight glasses you can't see; butterfly valves you have to beat open with a sledge hammer; oil in the bilge; exhaust leaks; main engine shutting down; sump pumps that don't work; steering pump leaking hydraulic oil. And that's just some of it.

---

[4] Hall testified in Newton meters, and Barras testified in foot pounds, which are alternative, interchangeable measurements.

Williams also testified that Gros did not follow Caterpillar recommendations for scheduled oil sampling on the engines, and that the sampling could help prevent engine failures. Further, preventative maintenance records were not kept on the M/V CAPTAIN WHITEY GROS, and Gros would only make "mandatory" repairs in an effort to save money.

Soon after Williams became the chief engineer on the M/V CAPTAIN WHITEY GROS, the vessel experienced a fire in the engine room. On January 27, 2011, the vessel lost steering, and Williams discovered that the wiring to the steering pumps had caught on fire. Williams testified that the wiring on the vessel was bad and brittle and needed to be replaced.

On January 29, 2011, Williams changed the oil on a generator and performed maintenance on an air compressor and day tank. While performing this work, Williams noted that there was "poor maintenance or no maintenance at all," before he arrived on the vessel.

On February 14, 2011, Williams noted that there was a lot of smoke in the engine room. It was coming from the rubber coupler between the engine and the gearbox on the starboard main engine.

On March 29, 2011, Williams notified a Gros port captain that the M/V CAPTAIN WHITEY GROS's starboard main engine was knocking. The port captain said that they would look into it, but Williams is not sure if they ever did. A few days later, he notified another Gros port captain of the issue, and nothing was done about it. Williams testified that when he notified the Gros port captains of problems, they would say they would look into it or tell Williams to monitor the situation, and "it was a band-aid effect."

On May 5, 2011, two days before the casualty, the starboard main engine shut down for no apparent reason. Someone came to fix the engine governor, but used an extension cord, rather than

11

wiring with the proper amperage to run the governor.  It was a temporary fix.  Williams advised
Gros that the vessel should not operate with the temporary fix, but they did so anyway, and the
starboard main engine threw the number three connecting rod through the block two days later.  At
the time, Williams thought that the improper wiring caught fire and caused the engine to overspeed
and throw a rod.

Williams also testified that the starboard main engine regularly experienced episodes of
overspeeding, which he documented in the logs.  Although Williams was not on the vessel on July
20, 2010, he identified a rough log entry from that date which stated that the office told the engineer
to disable the air line flap on the starboard main engine, which would allow the engine to keep
running and overspeed.

### e.  Captain Stephen Littlefield

Captain Stephen Littlefield was the captain of the M/V CAPTAIN WHITEY GROS at the
time of the casualty.  He had become captain of that vessel in January 2011.  Prior to his taking over
as master of the vessel, "that boat was not a vessel that anyone really wanted to work on," "[b]ecause
it was so poorly maintained . . . but it was starting to come back around to a point where people did
want to work on it."

Littlefield was on the vessel's deck preparing for his shift when the casualty occurred.  He
testified that he shut down the blowers to the engine room to eliminate the oxygen supply to any fire.
Littlefield did not hear any knocking or anything to indicate that the starboard main engine was
overspeeding prior to the explosion.  Littlefield does not think that the temporary wiring repair to
the governor caused the casualty because there was no overspeeding that would have indicated that

the governor had malfunctioned.  He had no knowledge of the starboard main engine overspeeding or surging at any time.

### f.   Keith Bergeron

Keith Bergeron testified that he has worked as port captain at Gros for many years.  He testified on June 4, 2010, the M/V CAPTAIN WHITEY GROS was awarded the Maltese Cross A1 AMS classification by the American Bureau of Shipping, indicating that the vessel passed its five year hull and machinery inspection.  He also testified that the vessel has maintained a Certificate of Inspection from the United States Coast Guard.

Bergeron testified that Gros was concerned with costs when Quality performed the engine work in 2010.  He requested that two pistons from the port main engine and one from the starboard main engine not be replaced because they had been replaced within six to nine months prior to the work in June 2010.

Bergeron testified that he did not think that the wire that appeared to be disabling the air flap on the starboard main engine could have disabled the air flap because the wire was not sufficiently taut to perform that function because of the strength of the parts involved.  He also testified that the engine had other fail safes that would prevent overspeeding even if the air flap were disabled.

### g.   Blaine Pelligrin

Blaine Pelligrin, a diesel engine mechanic, was a Gros employee who assisted Quality with the repair work to the M/V CAPTAIN WHITEY GROS's engines in June 2010.  At the time of the failure of the vessel's starboard main engine, Pelligrin was employed by Quality as a shop foreman. Pelligrin inspected the engine parts after the casualty.  He concluded that the number three connecting rod was thrown through the engine block, but he does not know why.  He does not

believe that the engine would fail in this manner eleven months after the work was performed due to under-torquing of connecting rod bolts.

### h.  Andrew Minster

Andrew Minster, a marine surveyor, testified as an expert witness on HCC's behalf.  Minster opined that the connecting rod was thrown through the engine block because the connecting rod bolts were not properly torqued.  Minster testified that he came to his conclusion by the process of elimination because there was no damage to any of the other cylinders, no oil "starvation," no contaminants in the oil, and no overheating.  Minster concluded that the bolts had to be under-torqued because there was no defect found in the connecting rod, which had been in use for years.  Minster testified that a bearing failure could cause this type of casualty, but that there would be metal in the oil, which would have caused scoring in the other cylinders.  Minster also testified that a lapse of eleven months is not too long for there to be a connection between the work on the starboard main engine and the failure of the number three connecting rod in that engine because the under-torquing of the connecting rod bolts would have caused flex in the area, and it would take time for the fillet, the weakest part of the connecting rod, to break.  Minster stated that the machining marks on the bolts are not evidence that they were not under-torqued, because there would not be a lot of movement in the bolts, but rather flex in the rods.  Minster is not a diesel mechanic and has never torqued the connecting rod bolts on a Caterpillar 3606 engine.

At his deposition, Minster testified that all of the connecting rod bolts in both engines were under-torqued, but he could not explain why only the number three connecting rod on the starboard main engine failed if the same torquing procedure was used on all of the connecting rod bolts in both engines. At trial, Minster changed his opinion and testified that connecting rod bolts on the number

14

three connecting rod were under-torqued, but he did not know the amount of under-torquing. Minster then returned to the opinion he articulated at his deposition: that the use of an improper torquing procedure implies that all of the connecting rod bolts were under-torqued when the vessel left the shipyard in June 2010.  Minster still did not have an explanation as to why only the number three connecting rod on the starboard main engine failed when all of the connecting rod bolts were torqued using the same procedure.

### I.  Dr. Courtney Busch

Dr. Courtney Busch, a metallurgist, testified as an expert witness on HCC's behalf.  Dr. Busch opined that the connecting rod bolts on the number three connecting rod were not properly torqued, which caused the connecting rod to fail at the fillets.  Dr. Busch based this opinion on an inspection of the connecting rod and bolts that he performed at Gros's warehouse.  Dr. Busch reconstructed the fractured rod assembly and opined that the initial fracture occurred at the "1-2 fillet" which was overloaded by bending stresses due to under-torqued bolts.  Dr. Busch concluded that the connecting rod failure was due to fatigue cracks originating at the fillet of the connecting rod due to lack of support provided by the bolts and nuts holding the upper and lower connecting rod bearing housing.  Dr. Busch testified that he found pitting at the parting plan where the lower connecting rod housing connected to the upper connecting rod, which is indicative of movement between the surfaces that usually happens when the connecting rod bolts and nuts are not sufficiently torqued.  Dr. Busch opined that the fillet failed first based on the multi-origin fatigue fracture and the fact that the fracture lines never came back together or mated.  Dr. Busch also testified that reusing the nuts contributed to their loosening and the fracturing of the connecting rod.

On cross examination, Dr. Busch admitted that he incorrectly reassembled the rod.  Further, Dr. Busch did not clean the parts or examine the mating surfaces where the nuts make contact with the rod to determine if there was evidence of movement that would indicate under-torqued bolts.  Dr. Busch admitted that the overspeeding of an engine "could fail a rod and crack the rest of them."

### j.  Dr. William Arnoult

Dr. William Arnoult, a metallurgist, testified as an expert witness on Quality's behalf.  Dr. Arnoult opined that the connecting rod bolts were not under-torqued prior to the failure because there was no evidence of impact loading which would damage the bolts' threads, there was no evidence of peening or mashing of the mating services, and there was evidence that the bolts failed under fatigue.  Dr. Arnoult cleaned the parts and examined them in his laboratory.  He realized that Dr. Busch assembled the rod incorrectly, and then properly reassembled it himself.  Dr. Arnoult examined the mating surfaces of the nuts and bolts under magnification and observed the machining marks, which he testified indicates that there was absolutely no movement of the nuts and bolts, indicating that the bolts were not under-torqued.  Dr. Arnoult would have expected to see fatigue or bedding fracture in the bolts if they were under-torqued, but this was not present.  Further, he testified that, while the connecting rod broke at the fillet, he would have expected the connecting rod to fail at the bolts if the bolts were under-torqued. He could not examine the torque on the other connecting rod bolts because the engines were sold after the accident.

### k.  Jay Webster

Jay Webster, testified as a diesel engine expert on Quality's behalf.  He testified that the vessel logs indicate that the M/V CAPTAIN WHITEY GROS's crew had trouble regulating the vessel's speed the day before the casualty, which can cause an overload failure.  Webster testified

that this would overload all of the engine's components, and that he thinks "this rod was overloaded," and "the most likely cause was overspeeding."  Webster testified that connecting rods do not wear out unless they are overstressed, and an overstressed rod can crack a fillet.

## ANALYSIS

HCC has not established by a preponderance of the evidence that it was more likely than not that the bolts on the number three connecting rod in the M/V CAPTAIN WHITEY GROS's starboard main engine were under-torqued on the day that it left the shipyard in June 2010. Although Barras did not use the most up-to-date Caterpillar approved torquing procedure, replace the nuts, or measure the bolts, he did visually examine the re-used parts, determined that they appeared sound, and used a torquing procedure that had been approved by Caterpillar and used successfully for many years.  Barras and Bourgeois testified that they used that same torquing procedure hundreds of times with no problems due to under-torqued connecting rod bolts, including on previous repairs on the M/V CAPTAIN WHITEY GROS's engines.  Further, the same torquing procedure was used on all of the connecting rod bolts in both of the M/V CAPTAIN WHITEY GROS's engines during the 2010 work.      Moreover, Dr. Busch's testimony is clouded by his incorrect assembly of the parts. Dr. Arnoult, who performed a thorough examination of the parts in his laboratory, opined that the connecting rod bolts did not demonstrate any signs that they were under-torqued.

Minster is not a metallurgist or diesel mechanic.  Minster's opinion is insufficient to demonstrate that the connecting rod bolts were under-torqued simply because there was a more up-to-date procedure, especially considering that the torquing procedure that Barras used has been used successfully for many years.  Further, Minster's opinion is unreliable because he changed his opinion

from his deposition to the time of trial, and the reverted to the opinion he articulated in his deposition.

The testimony of Williams and Littlefield establishes that the M/V CAPTAIN WHITEY GROS had a litany of mechanical problems, and a reputation for poor maintenance, including the repair of the governor and the tying of the air flap.  There were problems with the engines in the days leading up to the May 7, 2011, failure of the starboard engine.  Further, Williams and Bourgeois testified that Gros was concerned about cost, and did not heed their advice on repairs.  Rather, Gros only performed repairs that were required, not those that were recommended to keep the vessel properly maintained.

Therefore, HCC did not meet its burden of proving that it is more likely than not that the bolts on the number three connecting rod on the M/V CAPTAIN WHITEY GROS's starboard main engine were under-torqued when the vessel left the shipyard after in June 2010, and it cannot prevail on its claims against Quality or St. Paul.

## CONCLUSION

HCC did not meet its burden of proving that it is more likely than not that the bolts on the number three connecting rod on the M/V CAPTAIN WHITEY GROS's starboard main engine were under-torqued when the vessel left the shipyard in June 2010.  Therefore, it did not prove that Quality breached the implied warranty of workmanlike performance, and is not entitled to any recovery on its claim.

In its post-trial memorandum, Quality states that it is entitled to attorneys' fees under the MVA, and suggests that the issue be referred to the United States Magistrate Judge for determination.  Quality shall file a motion regarding its entitlement to attorneys' fees within ten days

18

of the date of this order, and that motion will be set for hearing before the District Judge. Plaintiffs shall respond in accordance with the Local Rules.  If the court finds that Quality is entitled to attorneys' fees, the matter will be referred to the United States Magistrate Judge for a Report and Recommendation on the amount of such fees.

New Orleans, Louisiana, this   31st day of May, 2013.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**